IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DEBORAH A. VERRETT,

       Plaintiff,                          No. CIV-S-06-1088 GGH

    vs.

MICHAEL J. ASTRUE,[1]
Commissioner of Social
Security,                                    <u>ORDER</u>

       Defendant.
_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). The case is a difficult one in that plaintiff clearly has medical problems, and for some time, attempted to work despite those problems. However, review of the case is hampered by some illegible treating physician records, the inherent difficulty in sifting through other competing opinions which provide evidence for both sides' viewpoints, and the rather lengthy time period under review where symptoms waxed and waned. In such cases, and even in light of some errors made, the law

---

[1] Michael J. Astrue became Commissioner on February 12, 2007. Accordingly, he should be substituted as defendant in this suit. Fed. R. Civ. P. 25(d)(1). No further action need be taken by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

favors leaving the determination where the ALJ has made it.  For the reasons that follow, plaintiff's Motion for Summary Judgment is DENIED, the Commissioner's Motion for Summary Judgment is GRANTED, and the Clerk is directed to enter judgment for the Commissioner.

BACKGROUND

Plaintiff, born September 19, 1957, applied for disability benefits on February 14, 2003. (Tr. at 48.)  Plaintiff alleged she was unable to work since January 6, 2003, due to neck, shoulder and back pain, including numbness down the right leg, headaches, carpal tunnel syndrome, lupus, and memory problems.[2]  (Tr. at 92, 98, 17, 18.)

In a decision dated September 7, 2005, ALJ Antonio Acevedo-Torres determined that plaintiff was not disabled.[3]  The ALJ made the following findings:

---

[2] Carpal tunnel syndrome, lupus, and memory problems were not listed in the original application for disability.  (Tr. at 66.)

[3] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's status post cervical fusion with ongoing osteoarthritic changes and intermittent upper extremity numbness, status post lumbar laminectomy with ongoing osteoarthritic changes, and status post right rotator cuff repair with ongoing osteoarthritic changes are considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the following residual functional capacity: lift 20 pounds occasionally and 10 pounds frequently, walk/stand four to six hours, sit six hours, occasionally perform postural activities, and frequently performed [sic] overhead reaching with the right upper extremity, and she has no visual, communicative, or other postural or manipulative limitations.

7. The claimant's past relevant work as a printed circuit board quality control supervisor did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8. The claimant's medically determinable status post cervical fusion with ongoing osteoarthritic changes and intermittent upper extremity numbness, status post lumbar laminectomy with ongoing osteoarthritic changes, and status post right rotator cuff repair with ongoing osteoarthritic changes do

---

process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id.

                not prevent the claimant from performing her past relevant work.

      9.      The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)).

(Tr. at 19-20.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Failed to Consider All of Plaintiff's Impairments at Step Two; B. Whether the ALJ Failed to Provide Legitimate Reasons for Rejecting Plaintiff's Treating Physician Dr. Duffy, Consultative Examiner Dr. Butowski, and Medical Examiner Dr. England; C. Whether the ALJ Failed to Credit Plaintiff's Statements Regarding the Nature and Extent of Her Pain and Functional Limitations; and D. Whether the ALJ Erred in Finding Plaintiff Could Perform Her Past Work and Stopping the Sequential Evaluation at Step Four.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct. 1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002).

\\\\\

ANALYSIS

    A.  Plaintiff's Impairments at Step Two

Plaintiff first contends that in considering plaintiff's impairments at step two, the ALJ did not find plaintiff's degenerative disc disease, sacroiliac joint dysfunction, and carpal tunnel to be severe impairments.

At the second step of the disability analysis, an impairment is not severe only if it "would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered." SSR 85-28. The purpose of step two is to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were taken into account. Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct. 2287 (1987). "The step-two inquiry is a de minimis screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). At this step, the ALJ may decline to find a severe impairment "*only* if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." Webb v. Barnhart, 433 F.3d 683, 686-87 (9th Cir. 2005) (emphasis in original).

The ALJ found only plaintiff's "status post cervical fusion with ongoing osteoarthritic changes and intermittent upper extremity numbness, status post lumbar laminectomy with ongoing osteoarthritic changes, and status post right rotator cuff repair with ongoing osteoarthritic changes," to be severe impairments.

Plaintiff points to the diagnosis of her treating physician, Dr. Duffy, who on May 25, 2004, diagnosed carpal tunnel syndrome on the left, and recommended a surgical consultation. (Tr. at 182.) This diagnosis was based on examination which indicated a positive Tinels, with decrease of 50% on the left in sensation and grip. (Id. at 182.) On May 25, 2005, one year later, Dr. England, an orthopedic surgeon, stated that plaintiff had lost about two-thirds of her grip strength on the right side compared to when he previously evaluated her on December 18, 2001. (Id. at 192.) Although the record is minimal in this regard, because step 2 is a de

5

minimis screening device, and because carpal tunnel syndrome was diagnosed, the ALJ erred in failing to find carpal tunnel syndrome to be a severe impairment.[4]

Plaintiff is probably correct in her contention that she had been diagnosed with degenerative disc disease, although Dr. England's diagnosis was qualified: "[s]he *probably* had degenerative disc disease with herniation and improvement after surgery." (Tr. at 187, 193. 195.) (emphasis added.)  Nevertheless, degenerative disc disease is not a disease, in the acute sense of the word, but a term to describe normal aging of the spinal discs which takes place in the aging process, and which may result in osteoarthritis and other conditions such as a herniated disc or spinal stenosis, and/or pain.  www.webmed.com.  In actuality, degenerative disc disease causes loss of fluid in the discs, and the space between the vertebrae decreases.  The body reacts by constructing bony growths called osteophytes which put pressure on the spinal nerve roots or spinal cord.  Id.  Degenerative disc disease has also been referred to as osteoarthritis in the spine. www.medtronic.com.  Degenerative joint disease[5] is another term for osteoarthritis.  The Merck Manual 1338 (16th ed.1992).  Based on this information, the ALJ's finding of osteoarthritic changes in the cervical, lumbar and shoulder areas appears to encompass degenerative changes which were diagnosed by various doctors.  Whether or not the ALJ included all the potential terms of art to describe plaintiff's ailments is of no consequence and does not affect the sequential analysis.

In regard to plaintiff's claimed sacroiliac joint dysfunction, Dr. England at first opined "possible sacroiliac joint dysfunction on the right," but then concluded, "the testing that I did was positive for sacroiliac joint dysfunction." (Id. at 194, 198.)  Sacroiliac joint dysfunction is difficult to diagnose "as no non-invasive diagnostic test has been found to be able to isolate the

---

[4] It will be discussed at a later stage of the sequential analysis that plaintiff obtained no treatment for this ailment.

[5] Plaintiff refers to degenerative disc disease and degenerative joint disease interchangeably in her brief.  Pl.'s Mot. at 12:10-12.

6

1  sacroiliac joint (short of anesthetic injection blocks specifically applied to the joint)."
2  www.spine-health.com. It does not appear that Dr. England applied an injection block to this
3  joint, but rather utilized other objective tests which gave positive results on the right side of the
4  back, such as Fortin finger test, Gaenslen's, Patrick's, compression of the pelvis, distraction of
5  the pelvis, and sacral thrust test. (Id. at 192.) Nonetheless, this court does not have the expertise
6  to second guess the diagnosis of any medical practitioner. Since Dr. England appears to have
7  diagnosed sacroiliac joint dysfunction, it must be considered a severe impairment. Nonetheless,
8  this undeveloped impairment is of questionable significance as sources such as spine-health.com
9  foresee conservative and successful treatment of the inflammation present. The court will not be
10 able to assume that this impairment precludes much functioning, if any.

   B. The ALJ Provided Specific and Legitimate Reasons for Rejecting Plaintiff's Treating Physicians

13    Plaintiff claims that the ALJ erred in rejecting the opinions of plaintiff's treating
14 physician, Dr. Duffy, Social Security consultative examiner Dr. Butowski, and the Worker's
15 Compensation qualified medical examiner, Dr. England.

16    The weight given to medical opinions depends in part on whether they are
17 proffered by treating, examining, or non-examining professionals. Holohan v. Massanari, 246
18 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[6] Ordinarily,
19 more weight is given to the opinion of a treating professional, who has a greater opportunity to
20 know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th
21 Cir. 1996).

---

[6] The regulations differentiate between opinions from "acceptable medical sources" and "other sources." See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources." Id. Medical opinions from "acceptable medical sources," have the same status when assessing weight. See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d). No specific regulations exist for weighing opinions from "other sources." Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons. Lester, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons. Lester, 81 F.3d at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001),[7] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. Lester, 81 F.3d at 831.

In this case, plaintiff has a history of surgeries in the low back, cervical area, and rotator cuff, due to various injuries. The ALJ first rejected the opinion of Dr. Duffy, dated November, 2003, that plaintiff could do less than a full range of sedentary work as a result of her chronic arm and neck pain, and past cervical fusion. (Tr. at 15.) The ALJ stated that this opinion was against other evidence of record, and gave it minimal weight as Duffy's records did not document clinical or diagnostic findings to support such limitations, and his recommended functional limitations were inconsistent with the determinations of the SSA physician and Dr.

---

[7] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

8

Kumar, a consultant who conducted an orthopedic evaluation. (Id. at 19.) The ALJ further minimized Dr. Duffy's opinion as the record failed to reflect any emergency room treatment, hospitalizations, surgery, chiropractor care, or recent physical therapy. Further, plaintiff's daily activities did not support the extent of limitation suggested by Dr. Duffy. (Id.)

Many of this treating physician's notes are illegible, (tr. at 112-21), but his progress report, dated January 15, 2003, noted plaintiff's pain symptoms in her neck and shoulder, recommended only conservative treatment, and planned for the next visit in six to eight weeks. (Id. at 122.)

On November 12, 2003, Dr. Duffy completed a residual functional capacity assessment, finding that she could walk, stand or sit for one to two hours in an eight hour day, for only 20 to 30 minutes at a time, that she could lift less than five pounds occasionally, that she could not climb stairs or ladders, that she needed to rest frequently, and could not work an eight hour day for five days a week. (Id. at 126-27.) His opinion was based on her chronic neck and arm pain, and past cervical fusion. (Id.)

Dr. Duffy also diagnosed carpal tunnel syndrome on the left, and said she would need a surgical consultation for it, but it does not appear that she ever received further treatment or consultation for it. (Id. at 182.) At this time, Dr. Duffy once again stated that plaintiff would continue conservative treatment and he would see her in six to eight weeks unless her symptoms changed. (Id.) Further, although Dr. England noted decreased grip strength on both sides, he did not limit her in a functional way as a result of it, but thought it reflected increased atrophy. (Id. at 192, 196.)

On February 1, 2005, it was noted that plaintiff had previous back surgery in which a disc was removed at L5-S1 in 1999; however, after some period of time with improvement, plaintiff's back worsened again. (Id. at 176, 195.) On April 19, 2005, Dr. Duffy noted an MRI which indicated a small bulging disc to the far lateral right side at L4-5. (Id. at 173.) The MRI, dated March 24, 2005, indicated narrowing of the L4-L5 neural foramina due to

9

1  the disc bulge, possibly compressing the exiting right L4 nerve. (Id. at 175.)  At this time, Dr.
2  Duffy requested a lumbar epidural. (Id. at 173.)  Although plaintiff had been complaining of pain
3  in the low back for some time, Dr. Duffy continued to recommend conservative treatment, saw
4  her only every six to eight weeks, and did not refer her to physical therapy or other treatment.
5  (Id. at 178, 180, 182.)  It appears that after her initial January 15, 2003, visit, plaintiff did not
6  return to Dr. Duffy for further treatment until October, 2003, indicating that her problems were
7  not as severe as alleged. (Id. at 114-15.)  Therefore, the ALJ gave specific and legitimate reasons
8  to give minimal weight to Dr. Duffy's functional limitations which are supported by the record.

In regard to Dr. Butowski, the ALJ rejected this neurologist's opinion that plaintiff would need to take a five to ten minute break every thirty to forty-five minutes because the SSA physician did not accept this limitation, Dr. Kumar did not identify any such limitation, and Dr. Butowski himself stated that she *may* need such a break, not that she did need such a break. (Id. at 19.)

Dr. Butowski, a consulting neurologist, performed a consultative orthopedic exam on March 27, 2004, with the benefit of a medical note, dated April 17, 2003, which extensively reviewed the records, but contained no other records.[8] (Id. at 154.)  He did limit the plaintiff as the ALJ described.  He also limited plaintiff to lifting and carrying up to 20 pounds occasionally and up to 10 pounds frequently. (Id. at 158.)  He added that bending, stooping, crouching, climbing, pulling, and balancing might be difficult on a frequent or occasional basis.  There were no limitations in reaching, handling, grasping, or fingering. (Id.)  Such limitations are not supported by Dr. Butowski's examination, however, which found normal range of motion in the cervical area, hips, knees, ankles, shoulders, and elbows, and slightly limited range of motion in the lumbar area. (Id. at 157.)  Straight leg raising was negative bilaterally.  There was no evidence of muscle spasms, tenderness, crepitus, effusions, deformities, or trigger points.

---

[8] Dr. Butowski is presumably referring to Dr. England's April 17, 2003 report which reviewed plaintiff's medical history between 1995 and 2002. (Tr. at 130-40.)

Sensory exam and motor strength were normal. (Id.) Furthermore, plaintiff sat comfortably during the exam and had no trouble ambulating around the room and on and off of the examining table. (Id. at 155-56.)

Dr. England saw plaintiff a total of six times in regard to a worker's compensation claim. His most recent report, dated May 27, 2005, reviews her history and notes that Dr. Duffy had twice found she could go back to work, but that she had not been allowed to return because she was taking a lot of pain medication and the school was concerned about the safety of the children if she were to drive a bus. (Id. at 187.) At the time Dr. England saw her, she was taking no medication, but she was still not permitted to return to her bus driving job. She was also not sent for any vocational rehabilitation. The most recent evaluation states, "she was clearing from her symptomatology." The previous MRI, dated five years earlier, on June 14, 2000, found degenerative disc disease at C4-5, C5-6, and C6-7, associated with spondylitic spurring, and borderline canal stenosis at C5-6. There was no frank disc herniation. Plaintiff reported that at this time she was having no pain in the right shoulder or neck, but that she would experience pain every three to four months. (Id.) Dr. England in his previous reports found that plaintiff was not a Qualified Injured Worker. (Id. at 187-88.)

At the time of the most recent evaluation plaintiff reported renewed pain to her lower back which began one and a half to two years earlier, and occurred about 50 percent of the time. An MRI was done about two months earlier, and Dr. Duffy was planning to do further studies including a dye injection, but there were no records from Duffy on any of this. (Id. at 189, 190.) Plaintiff was also having right shoulder pain in the shoulder blade about 50 percent of the time. (Id. at 190-91.) Range of motion of the back was 75 percent of normal, and 50 percent of normal in the cervical spine. (Id. at 192, 193.) Range of motion in the upper extremities was normal, despite plaintiff's complaint that she had lost range of motion in the shoulder. (Id. at 193, 191.) The diagnosis was probable shoulder sprain, degenerative disc disease in the cervical and lumbar spine, probable double crush, possible sacroiliac joint dysfunction on the right. (Id.

11

at 194.) Dr. England would not make a final assessment of her disability in relation to her back without recent records, including planned diagnostic tests. In regard to her cervical spine and upper extremities, Dr. England would restrict plaintiff to no overhead work on the right and no lifting more than five to ten pounds to waist level. He did not think plaintiff could return to her job as bus driver. (Id. at 196.)

It should be noted that no physical therapy was recommended in Dr. England's lengthy review of the medical history.

It was appropriate for the ALJ to reject the functional limitations of these physicians as Dr. Kumar's report, dated May 10, 2003, did not impose such restrictions. Instead, his exam, without the benefit of medical records, found that plaintiff had limited range of motion in the cervical and lumbar spine, but normal range of motion in the shoulders, wrists, hands, elbows, and elsewhere. (Tr. at 143-44.) Although plaintiff had "reduced sensation in the entire right lower extremity in a non-dermatomal distribution," her motor strength was 5/5 in the upper and lower extremities. (Id. at 144.) This physician found that plaintiff could stand and walk six hours per day, with unlimited sitting. She could lift and carry twenty pounds occasionally and ten pounds frequently. She could do frequent overhead activities with the right upper extremity, along with occasional bending and stooping. There were no fine manipulative limitations. Plaintiff could do all of these activities despite previous cervical, lumber, and right shoulder surgeries. (Id. at 145.)

The ALJ also relied on the SSA physician who reviewed all of plaintiff's medical records, from at least 1998 through 2003,and although he did not examine her, he found that despite her history of back, neck and shoulder surgery, she could lift 20 pounds occasionally and 10 pounds frequently, stand, walk, and sit for six hours a day, push and pull without limitation, frequently kneel, crouch and crawl, and occasionally climb, balance and stoop. (Id. at 148-49.) Overhead reaching on the right was limited. (Id. at 150.)

\\\\\

Although Dr. Kumar's report, along with the SSA's evaluation, is probably not the bulk of the evidence and perhaps not the best evidence, it is substantial evidence on which the ALJ appropriately relied. "Where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995), citing Magallanes, 881 F.2d at 751. Therefore, it was within the ALJ's province to chose to rely on one consultant over another. Furthermore, "A statement by any physician that the claimant is disabled or unable to work is a conclusion on the ultimate issue to be decided . . . and is not binding on the [ALJ] in reaching his determination as to whether the claimant is disabled within the meaning of the [Act]." Murray v. Heckler, 722 F.2d 499 (9th Cir. 1983) (citing Burkhart v. Bowen, 856 F.2d 1335 (9th Cir. 1988), 20 C.F.R. §§ 404.1527 and 404.927); accord, Magallanes v. Bowen, 881 F.2d 747, 750-51 (9th Cir. 1989). The ALJ gave specific and legitimate reasons in rejecting the opinions of Drs. Butowski and England, properly following the standards set forth in Lester.

Although the ALJ later rejected plaintiff's credibility by relying in part on the records of these physicians which he had previously rejected or minimized, he had rejected them only in terms of their functional limitations. (Id. at 18.) See discussion Section C infra. The court finds no error in the ALJ's decision to rely on some of the physicians' findings, while rejecting others, so long as his conclusions are supported by substantial evidence in the record.

C.  The ALJ Did Not Err in Rejecting Plaintiff's Credibility

Plaintiff contends that the ALJ erred in rejecting her testimony regarding the nature and extent of her pain and functional limitations.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit

13

credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Id. at 345-46. If the record contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[9] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be clear and convincing. Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

---

[9] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

In this case, the ALJ found plaintiff's complaints regarding her physical limitations and pain to be not fully credible because the SA physician found that she could do a slightly modified range of light work based on a review of her medical file. (Id. at 17-18.) Further, Dr. Duffy's treatment of plaintiff's problems was conservative, as outlined by the ALJ. Objective evidence did not reflect the severity of plaintiff's complaints. For example, there was only one time where plaintiff exhibited decreased grip and sensation on the left, positive Tinel's, and tenderness in the right knee. (Id. at 18.) Tenderness of the upper extremities was only mild. (Id.) The most recent MRI from March, 2005 indicated narrowing of the neural foramina at L4-5 with a disc bulge, but no herniation, protrusion or stenosis. During his treatment of plaintiff, Dr. Duffy only administered one epidural injection. (Id.) In addition to these points made by the ALJ, he noted that plaintiff did not obtain physical therapy or chiropractor treatment, and she only saw Dr. Duffy every six to eight weeks, and sometimes went months without office visits. Dr. Duffy himself noted in his progress reports that treatment was "conservative." (Id. at 122, 182.) Dr. Duffy also did not recommend surgery during the four years that he treated her. Her more recent pain medication was limited to Motrin and Tylenol, but she claimed not to be taking any pain medication, and tries not to take it daily, as a result of severe reactions due to her compromised immune system from Lupus. (Id. at 155, 188, 207, 209010.) The ALJ additionally referred to plaintiff's testimony that pain medication does help her back pain. (Id. at 208.)

The ALJ additionally reviewed plaintiff's testimony regarding her daily activities, which is supported by the testimony. (Id. at 17.) She takes turns cooking with her daughters who live with her. They do the heavier housecleaning, but she does grocery shopping, and laundry when she can. (Id. at 211.) The rest of the time she testified that she watches television or stays in bed. (Id.) In addition to plaintiff's testimony, the ALJ referenced her daily activities questionnaire wherein she stated on February 28, 2003, that she grocery shops once per week, cleans the house, does yard work, albeit with pain, and drives. (Id. at 17, 87-88.)

\\\\\

1    The ALJ then discussed Dr. Kumar's functional evaluation, which recommended
2 light work, and why it was more consistent with the objective evidence than the functional
3 limitations imposed by Drs. Duffy and England. (Id. at 18.) See discussion *supra* section B.
4    Although not specifically raised by plaintiff here, other complaints made by
5 plaintiff are not supported by the record, and raise questions about her credibility, as discussed by
6 the ALJ. For example, plaintiff claimed to have memory problems, seizures, carpal tunnel
7 syndrome, and lupus; however, the ALJ correctly noted that there was no evidence that plaintiff
8 sought treatment for these alleged ailments. (Id. at 17, 18.) It is the ALJ's province to assess the
9 testimony of witnesses who appear at hearing. Fair v. Bowen, 885 F.2d 597, 604 (9th Cir.
10 1989). The ALJ's analysis of plaintiff's credibility was appropriate and supported by substantial
11 evidence in the record.
12    D. The ALJ Did Not Err in Finding Plaintiff Could Perform Her Past Work and Stopping
13    the Sequential Evaluation at Step Four
14    Plaintiff contends that her past work as circuit board supervisor did not constitute
15 substantial gainful activity, and that even if it did, the medical evidence precludes her
16 performance of this work based on her limitations.
17    Plaintiff bears the burden of proving she suffers from a physical or mental
18 impairment that makes her unable to perform "past relevant work." Andrews v. Shalala, 53 F.3d
19 1035, 1040 (9th Cir.1995). Plaintiff cannot merely show she is incapable of performing the
20 particular job she once did; she must prove he cannot return to the same type of work. Villa v.
21 Heckler, 797 F.2d 794, 798 (9th Cir.1986). In determining whether a disability applicant can
22 perform past work, the Commissioner may consider work as it was actually performed, or as it is
23 normally performed in the national economy. The ALJ determines the demands of a past job and
24 compares the demands to current RFC. Villa, 797 F.2d at 798.
25    Plaintiff argues that the last year she performed this type of work was in 1990, and
26 she only earned $6,723 that year. (Id. at 58.) She contends that the monthly wage is only $560

16

on average, which is below the statutory minimum of $900 per month. Defendant points out that the statutory minimum monthly salary is only $500 per month, and therefore this work qualifies.

20 C.F.R. § 404.1574(b)(2)(i) (Table 1) provides that work done in calendar year 1990 constitutes substantial gainful activity if it is more than $500 per month. Therefore, plaintiff's past work as circuit board inspector qualifies as substantial gainful activity.

In regard to whether plaintiff can do this type of work with her limitations, plaintiff argues that the opinions of Drs. Duffy, England, and Butowski preclude her from this work because the job of circuit board supervisor requires excellent manipulative skills, as well as extended sitting and/or standing.

First, the nature of plaintiff's past work should be clarified as it has been described as both inspector and supervisor in the record. Plaintiff cites the Dictionary of Occupational Titles 726.684-062, which describes the job of "inspector, printed circuit boards."[10] The ALJ described plaintiff's past work as "printed circuit board quality control supervisor," which he found to be at the light level. (Id. at 19.) In so finding, he referred to exhibits which variously describe plaintiff's past work as printed circuit board quality control supervisor (tr. at 34, 90), and circuit board inspector (tr. at 42, 89), as described by the SSA. Plaintiff describes her work as "Q.C. inspector, lead, supervisor, printed circuit boards." (Tr. at 78.) One SSA analyst assigned DOT code 726.684-062, which is the same code referenced by plaintiff in her argument. This job is considered light work and is described as "inspector, printed circuit boards":

---

[10] The United States Dept. of Labor, Employment & Training Admin., Dictionary of Occupational Titles (4th ed. 1991), ("DOT") is routinely relied on by the SSA "in determining the skill level of a claimant's past work, and in evaluating whether the claimant is able to perform other work in the national economy." Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir. 1990). The DOT classifies jobs by their exertional and skill requirements. It is used by the SSA to classify jobs as skilled, unskilled, or semiskilled. (Id.) Each job is assigned a number reflecting how long it generally takes to learn the job, termed "specific vocational preparation" ("SVP") time. (Id.) The DOT is a primary source of reliable job information for the Commissioner. 20 C.F.R. § 404.1566(d)(1).

> Performs any combination of following tasks to inspect and repair printed circuit boards (PCB's): Inserts plug gauges into drilled holes of PCB panels to verify conformance to specified dimensions. Measures thickness and dimensions of plating on PCB panels to verify that plating meets specifications, using micrometers, dial indicators, calipers, rulers, eye loupes, and electronic measuring devices. Examines PCB circuitry to detect defects, such as shorts, breaks, excess or missing solder, scratches, cracks, and incorrect layout, using light table, eye loupe, magnifier, or microscope. Brushes solder mask ink on PCB's to repair defects in screen printing. Scrapes excess plating, or solder mask ink from PCB's, using utility knife. Repairs broken circuitry, using soldering iron or circuit bonding equipment. Records type and quantity of defective PCB's. Tests adherence of solder mask ink to PCB's, using tape. Tests continuity of PCB circuits, using bare board tester. May inspect inner layers of multilayer PCB's to verify that internal alignment and location of drilled holes meet specifications and be designated X-Ray Technician, Printed Circuit Boards (electron. comp.).

DOT 726.684-062.

This job is not a supervisor job as plaintiff described her work, and it is not clear whether the ALJ relied on this analyst's description, but even if it is considered past work, and if the ALJ relied on this DOT code, it was proper for him to do so because it is consistent with Dr. Kumar's opinion that plaintiff could do light work.  ecause the ALJ properly rejected the functional limitations imposed by Drs. Duffy, Butowski and England as analyzed above, he was not required to follow them in determining whether plaintiff could do her past work.

If the ALJ relied on the opinion of another SSA analyst and plaintiff herself, that plaintiff's past work was more properly described as a supervisor, the DOT code assigned by the analyst for this job was 726.361-018 which is described as "group leader, printed circuit board quality control":

> Assists SUPERVISOR, PRINTED CIRCUIT BOARD ASSEMBLY (electron. comp.) 726.134- 010 in coordinating activities of workers engaged in inspecting, testing, and repairing printed circuit boards (PCB's), applying knowledge of electronic theory, test procedures, repair techniques, and quality standards: Confers with SUPERVISOR, PRINTED CIRCUIT BOARD ASSEMBLY (electron. comp.), and reviews production schedules to determine quantity and type of PCB's to be inspected, tested, or repaired. Compiles list of test and inspection personnel and assists

18

> in planning department work assignments. Assigns duties to inspection, test, and repair personnel, using knowledge of workers' experience and capabilities. Collects PCB's and components for processing from receiving and assembly departments and distributes PCB's and components to inspection, test, or repair personnel. Oversees department activities and revises work assignments to meet production schedules and contract priorities. Explains inspection, test procedures, and specifications, and demonstrates use of testing equipment and PCB repair techniques to workers. Interprets schematic drawings, procedure changes, and work orders for workers. Assists workers in resolving technical problems, utilizing knowledge of electronic theory, test procedures, and specifications. Confers with technical personnel and department supervisors to report and resolve assembly and testing problems, and reports unresolved problems to SUPERVISOR, PRINTED CIRCUIT BOARD ASSEMBLY (electron. comp.). Requisitions, obtains, and distributes supplies, materials, and equipment, such as electronic components and parts used for repair work, test and inspection specifications and test equipment, fixtures, and handtools. Inspects test equipment to verify equipment functions according to standards. Reports substandard equipment performance to supervisor or maintenance personnel. Reads, prepares, collects, and maintains reports, such as individual and department production reports and test results, employee time and attendance records, and product waste reports. Maintains vendor files. Substitutes for absent workers and assists workers to alleviate work overload situations.

DOT 726.361-018.

This job is also considered light work. It does not, however, appear to have the same degree of manipulative skills as required for the inspector job as it entails supervising the inspectors. Although there probably is a great deal of standing and walking involved, the ALJ properly relied on substantial medical evidence in finding that plaintiff could do this type of work. Further, based on plaintiff's description of her past work, it is more likely that this supervisor job is in line with the work she actually performed in the past. The ALJ properly ended the sequential analysis at step four in finding that plaintiff could do her past work.

CONCLUSION

In sum, the court finds the ALJ's assessment is fully supported by substantial evidence in the record and based on the proper legal standards. Accordingly, plaintiff's Motion for Summary Judgment is DENIED, the Commissioner's Cross Motion for Summary Judgment

is GRANTED, and the Clerk is directed to enter Judgment for the Commissioner.

DATED: 7/31/07

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Verrett1088.ss.wpd